**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2627-25

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

SHADEED ALSTON,

    Defendant-Appellant.

_____

Argued May 4, 2026 – Remanded May 4, 2026
Resubmitted June 8, 2026 – Decided July 1, 2026

Before Judges Sabatino, Walcott-Henderson and Bergman.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 26-01-0168.

Scott M. Welfel, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Connor Bell, Assistant Deputy Public Defender, and Scott M. Welfel, of counsel and on the briefs).

Frank J. Ducoat, Deputy Chief Assistant Prosecutor, argued the cause for respondent (Theodore N.

Stephens, II, Essex County Prosecutor, attorney; Frank J. Ducoat, of counsel and on the briefs).

PER CURIAM

In this interlocutory appeal first presented to us as an emergent matter, defendant contests a March 27, 2026 order of the trial court compelling him to turn over to the State recordings obtained by a defense investigator from a retail store's surveillance equipment, most specifically footage presumed to be from November 18, 2025. The trial court's subsequent in camera review of that footage has revealed that the supposed "November 18" recording appears to have been filmed at a different date and time.

Given this important development, we remand this matter to the trial court a second time to re-evaluate the relevance of the footage, and to weigh any such relevance against the constitutional arguments of privilege asserted by the defense.

We summarize the pertinent background that frames our discussion.

<u>November 6, 2025 Robbery</u>

On November 6, 2025, an armed robbery occurred in a Dollar General store. Surveillance footage from two cameras in the store, which is in the possession of both the State and defendant, shows that at approximately 6:09 p.m. that day, a tall, black, male wearing a black hooded sweatshirt and a black

puffer jacket entered the store. The male took a shopping cart and walked into the aisles away from the view of the cameras. Several minutes later, at 6:20 p.m., that same man, with his cart full of items from the store, attempted to run through the doors with the cart without paying for the items.

An employee from the Dollar General store, Brittani Blackwell, ran after the man. She wrestled with him over the cart, but shortly after, she ran back inside the store without him.

According to the police report of the incident, as Blackwell was wrestling with the man over the cart, she saw him put a hand into his jacket pocket and pull out an object that she, at the time, perceived as a firearm. Blackwell yelled that the man was armed and retreated back to the store.

One of Blackwell's co-workers ran out of the store and attempted to stop the man, but he fled the scene on foot. A video camera in the store briefly revealed the man's clean-shaven face. A still photograph of his face taken from the video did not yield any matches, after the police submitted it to "Facial Recognition" analysis.

November 18, 2025 Terroristic Threats Incident

Twelve days later, on November 18, 2025, police were called to the Dollar General store at approximately 7:35 p.m. Store employees told the police that

A-2627-25

they believed the same man who had robbed the store earlier, again dressed in black clothing, had returned and began filling a shopping cart with items. Blackwell, who was working that day, thought she recognized the man and asked him to leave.

As described to police, the man became irate and began throwing various merchandise on the ground, including a soda can that he had drank from. According to Blackwell, he then said, "you're going to get two headshots today" and made a gun gesture with his fingers to the side of his head. He left the store by allegedly kicking open the back door and setting off the emergency alarm.

Police officers Anthony Dos Santos and Connor O'Keeffe, both wearing their body-worn cameras ("BWC"), arrived at the store to investigate roughly ten minutes later at or around 7:43 p.m. They were greeted by an employee who had not witnessed the threats. As the officers moved through the store to interview Blackwell, the other employee saw a tall, black male wearing a black hoodie and a red beanie in the shampoo aisle and asked him to leave the store. That man was later identified as defendant.

After hearing the description of the perpetrator from Blackwell, Officer O'Keeffe suspected Blackwell was describing defendant. O'Keeffe ascertained defendant had previously been arrested on another matter.

A-2627-25

After O'Keeffe showed her a photo, Blackwell identified defendant as the person who had robbed the store on November 6 and who had threatened her on November 18, specifically saying defendant resembled the robber "in a way." At around this same time, another employee at the store can be seen on the BWC footage speaking to other officers and discussing how the store's surveillance cameras had been "down" for the past four days.

Other officers found defendant near the store later that night on November 18, possessing several shampoos and body washes from the Dollar General store. The officers detained him. Blackwell and the other co-worker who had witnessed the first robbery, positively identified defendant as the man who had made the threats that night and the man who previously had robbed the store.[1]

Defendant was thereafter indicted and charged with the November 6 robbery and for making terroristic threats on November 18.

<u>Discovery and the Defense's Possible Possession of "November 18" Surveillance Video Footage</u>

Defendant was assigned a public defender, who shared the November 6 surveillance footage with the prosecution on March 10 as part of reciprocal discovery. Defense counsel represented that the November 6 store surveillance

---

[1] Defendant's face is most clear when O'Keeffe searches him on the BWC video, and he notably has a full beard and a wound on his forehead.

A-2627-25

footage had been obtained from the store by a defense investigator and noted that it had not previously been in the State's discovery.

The public defender also stated he intended to use the BWC footage and defendant's mugshot from November 18 to advance the argument that Blackwell had misidentified defendant as the November 6 robber and thus, incorrectly, as the individual who later made terroristic threats on November 18.

Defense counsel and the assistant prosecutor assigned to the case had a phone conversation on March 11, 2026. In that call, defense counsel reportedly told the assistant prosecutor that a defense investigator had obtained footage from November 18. Apparently, the police did not initially subpoena the Dollar General store because, as noted above, they had been told the store's recording equipment ("DVR") for that day was malfunctioning. When the police eventually attempted to obtain a copy of any such November 18 recording, they were told "the footage was inoperable and that, if it did exist, the footage exceeded retention time."

The State moved to compel defendant to produce all video evidence within five days. Defendant opposed the motion, arguing that the video evidence was privileged from compelled turnover.

Oral Argument and Order to Compel

Oral argument was heard on the State's motion on March 20, 2026. At that hearing, the court was informed by defense counsel that the defense did not intend to use the November 18 footage at trial. Specifically, defense counsel asserted that he had "no reason to doubt what was represented by the store to police, that the DVR was malfunctioning." He elaborated further "I have no reason to believe that there is actual footage from basically what the State is seeking . . . that on November 18th, the DVR was working and recording incidents alleged on November 18th." However, counsel did not deny that he did have some surveillance footage other than that filmed on November 6.

The court issued an initial oral decision on March 27, 2026, granting the State's motion to compel defendant to turn over "all surveillance footage in [d]efense's possession" including the November 18 recording, pursuant to Rule 3:13-3(b)(2)(B). The court reasoned that the November 18 footage was not evidence created by defense counsel, nor was it legal work product, and therefore was not privileged from disclosure. The court memorialized that ruling in a written order on March 30, 2026.

This Appeal

Defendant then filed the present emergent appeal. As his principal

A-2627-25

argument, defendant contended he has a privilege under the Sixth Amendment to decline to turn over the recording, assuming for the sake of argument it is even in the defense's possession. The defense asserted that upholding turnover in this case would have a drastic chilling effect on defense investigations and advocacy. The State countered that no such constitutional prohibition exists, and that the supposed recording may be evidence of a criminal offense committed on November 18. We issued an interim stay of the trial court's turnover order while the appeal was pending.

At oral argument before us, a key threshold question was whether what was referred to as "the November 18 recording" was even in the defense's possession. The existing record was unclear and failed to resolve this question, and defendant's appellate counsel then was unable or reluctant to stipulate the defense possessed such footage. Consequently, we remanded the matter to the trial court to resolve this basic factual question.

The Remand Order

Our remand order issued on May 4, 2026 stated as follows.

> This interlocutory matter concerns the trial court's March 30, 2026, order directing defendant, over objection, to furnish the State with "all surveillance footage in [d]efense's possession relating to [the indictment]." We granted defendant leave to appeal

that order on emergent basis on March 31, 2026, and thereafter, received briefs and heard oral argument.

Defendant presently argues that the turnover of the video footage, if it is in his counsel's possession, would violate defendant's constitutional rights under the Sixth Amendment.

The focal point of the dispute concerns whether defendant's counsel possesses video footage derived from the surveillance video apparently recorded by the property owner on November 18, 2025, a date on which defendant is charged with making terroristic threats on the premises. The present record is not entirely clear and substantiated as to whether defense counsel possesses video footage from November 18, 2025.

In order for this court to conduct its appellate review, it would be helpful to know with certainty whether defense counsel actually possesses video footage derived from a recording made on November 18. Regardless of whether defense counsel possesses footage of events on other dates. Accordingly, we summarily remand this matter to the trial court to make a factual finding concerning that specific question. The trial court has the discretion to consider certifications and conduct an evidentiary hearing to assist in making that factual finding.

The remand shall be completed with a written factual finding by no later than May 28, 2026. The respective parties can then file simultaneous letter briefs with this court no later than June 8, 2026, not to exceed five pages each. These deadlines are peremptory. Jurisdiction is retained.

The Remand Proceedings and the Trial Court's Findings

On remand, the trial court reviewed, in camera, a video supplied to it by defense counsel under seal, which had been purported to contain footage from the store recorded on November 18. The court compared the surveillance footage with the BWC recordings made by the police during their appearance at the store on November 18. The court also considered other related submissions from the parties, including confidential documents from the public defender, and heard oral argument.

Unfortunately, the court's in camera review revealed that what had been described as the "November 18 recording" turned out to be incomplete and most likely had been filmed at a different date and time. The court's written decision, dated May 28, 2026, made the following findings that are particularly noteworthy to us:

> In reviewing the security cameras covering the entire day of store operations, <u>no police officer is seen which seems to indicate that the security cameras contain the wrong date and time stamp. It is clear to this court that the time stamp may be off by as much as two and [a] half hours.</u> The camera shows a store employee opening the store at 5:21 a.m. When the gates are lifted the sun was shining. The court can take judicial notice that at 5:21 a.m. in November the sun is not shining. Also, the first customer walks in the store at 5:38 a.m. when the store opening is at 8:00 a.m. <u>It is those observations that lead the court to calculate that the</u>

A-2627-25

> cameras are approximately two and a half hours behind. Also the court observed the store closing at approximately 19:30, which is an hour and a half earlier than the advertised closing time of 9:00 p.m.
>
> [(Emphasis added).]

The parties have also submitted, as requested, supplemental letter briefs addressing these findings. Defendant continues to assert that he has a constitutional privilege under the Sixth Amendment to decline to turn over the footage. Additionally, he argues that turnover will negatively impact the ability of public defenders to advocate effectively for their clients. Among other things, he submitted a certification from the State Public Defender, which attests that, if turnover is required, public defenders "will be deterred from obtaining surveillance video" for fear that such a video might help the State's case. The State maintains in response that it has the right to the footage, regardless of the actual date and time it was recorded and how the defense obtained it.

Rule 3:13-3(b)(2)(B) requires post-indictment defendants to turn over all "relevant material" to the State such as "tangible objects . . . or copies thereof" which include, but are not limited to "writings, drawings, graphs, charts, photographs, video and sound recordings, and any other data." (Emphasis added). Additionally, the identities and written statements of witnesses must be disclosed so long as defendant plans to use them "at trial." R. 3:13-3(b)(2)(C)

11

to (D). However, the rule exempts any party's "work product consisting of internal reports, memoranda or documents made by that party or the party's attorneys or agents[.]" R. 3:13-3(d).

As part of a criminal defendant's Sixth Amendment right to counsel, it is essential that defense attorneys "be permitted full investigative latitude in developing a meritorious defense" and "[t]his latitude will be circumscribed if defense counsel must risk a potentially crippling revelation to the State of information discovered in the course of investigation which he chooses not to use at trial." State v. Mingo, 77 N.J. 576, 582 (1978).

In that same vein, in State v. Williams, 80 N.J. 472, 480 (1979), the Supreme Court held that the State was not entitled to a witness's identification of a defendant from a photo array, when that identification had been arranged and prepared by defense counsel, and defense counsel did not intend to use the identification at trial. The Court emphasized that allowing the State to obtain inculpatory material prepared by defense counsel to bolster his client's defense would have a "chilling effect" on investigating the charges against defendant. Id. at 478. "Blanket discovery of the fruits of this kind of legal creativity and preparation may impact directly upon the freedom and initiative which a lawyer must have in order to fully represent his client." Id. at 479.

In State v. Knight, 256 N.J. 404, 413 (2024), a criminal defendant attempted to apply this same logic to prevent the disclosure of a witness's recantation affidavit, which was obtained through third-party intimidation and delivered to defense counsel, to the State. The Supreme Court distinguished these circumstances from those of Mingo and Williams because in Knight, "defense counsel played no role whatsoever in the genesis of [the witness's] affidavit." Id. at 422.

Further, in State v. Ross, 256 N.J. 390, 393 (2024), a companion opinion with Knight, the Supreme Court held that a bullet removed from a defendant through an elective surgery he chose to undergo because of his attorney's advice was not protected from reciprocal discovery. Like the affidavit in Knight, the bullet was "physical evidence that came into existence at the time of the alleged criminal offense" and did not "materialize" or "come into existence" through the investigative efforts of defense counsel. Id. at 402. The Court in Ross distinguished the bullet as physical evidence of a crime and not the "fruit of a defense investigation" because neither defense counsel nor his agents contributed to the bullet's creation and relation to the charged criminal offense. Ibid.

A-2627-25

With these principles in mind, we turn to the matter before us, as clarified by the trial court's in camera factual findings. As the trial court noted, it is apparent that the video footage obtained by the defense investigator does not contain evidence of anyone making terroristic threats or causing a disturbance on November 18. The footage also does not show police interview any store employees or enter the premises at all despite the November 18 BWC footage showing police in the areas covered by the cameras. As defense counsel suggested, and the trial court found to be most likely, the recording appears to be from a different date and time, and the time stamps on the recording device are apparently erroneous.

Defendant does not intend to present the footage at trial. See Williams, 80 N.J. at 482 (requiring disclosure to the State of evidence of oral statements "only in a situation where the defense intends to use the statement or memoranda at trial"). Moreover, unlike the bullet in Ross or the affidavit in Knight, the "November 18" recording is not physical evidence of the charged offense of terroristic threats. Nonetheless, the State beseeches us to uphold the compelled turnover of the video because it claims an interest in seeing it.

Having noted this, the question remains whether the surveillance recording obtained by the defense investigator—on whatever actual date or time

14

span it was filmed—now must be turned over to the State in light of what is now known. Given the narrow scope of the specific factual question we had asked the court to determine on remand, the court understandably did not reach what it described as "the central question surrounding [the] defense's obligation to turn over a video that came into their possession to the exclusion of the State because of the store's representations and retention technology."

We remand this matter again to the trial court to now re-evaluate that "central question," in light of the additional information it gleaned through the in camera review. As we noted in our introduction, the trial court shall re-evaluate the relevance of the footage, and weigh any such relevance anew against the constitutional arguments of privilege asserted by the defense, as they have been amplified on this appeal.

To aid the trial court in that undertaking, we ask defense counsel to supply the trial court within ten days with copies of all appellate submissions of both parties.

At the conclusion of the remand, the trial court is requested to determine whether its original turnover order should be maintained, modified, or rescinded, in light of the additional information learned about the so-called "November 18" recording and the additional advocacy presented. We do not retain jurisdiction.

15

The emergent stay we imposed under <u>Rule</u> 2:9-8 is hereby vacated, subject to the outcome of the remand. After the trial court's ruling, either party may file a non-emergent motion for leave to appeal; if such a motion is filed, this court will assess whether any further appellate intervention in this discovery dispute is warranted.[2]

Remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division

---

[2] We are mindful of the possibility that the discovery dispute might become moot. In that regard, we note the May 15, 2026 transcript contains some colloquy among counsel and the court about plea discussions and the need for counsel to notify the court promptly if the case resolved. Of course, we offer no views about the substance of whatever discussions may or may not have occurred.

16